

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 19, 2022.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-52001-cag |
| | § | |
| ARTHUR SILVA, | § | |
|     Debtor. | § | CHAPTER 7 |
| | § | |

| | | |
|---|---|---|
| | § | |
| DANNY G. WILSON, | § | |
|     Plaintiff | § | |
| v. | § | ADVERSARY NO. 21-05036-cag |
| ARTHUR SILVA, | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S ORIGINAL COMPLAINT TO DENY DISCHARGE OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6), OR, IN THE ALTERNATIVE, TO DENY DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(4)[1]**

Came on to be considered on March 23, 2022, the trial on the merits on Plaintiff Danny G.

Wilson's Original Complaint to Deny Discharge of Debt Pursuant to 11 U.S.C. § 523(a)(2) and

---

[1] Prior to trial, Defendant filed his Motion for Summary Judgment alleging that the Court should grant summary judgment in favor of the Defendant as to the §§ 523(a)(2) and (6) claims. (ECF No. 11). Plaintiff filed his Response in opposition. (ECF No. 12). On November 10, 2021, the Court announced its ruling on the record finding that summary judgment should be granted as to Defendant for the § 523(a)(2) claim but not the § 523(a)(6) claim. (ECF No. 21).

(a)(6), or, in the Alternative, to Deny Discharge Pursuant to 11 U.S.C. § 727(a)(4) (ECF No. 1)[2] ("Complaint"). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is referred to this Court under the District's Standing Order on Reference. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2)(I) (determination of the dischargeability of debts). Venue is proper in the Western District of Texas under 28 U.S.C. § 1409. The following is the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052(a).[3] Wilson filed his Statement Regarding Consent (ECF No. 8) which consents to the entry of final orders and a final judgment by this Court. Defendant Arthur Silva filed his Statement Regarding Consent (ECF No. 7) which consents to the entry of final orders and a final judgment by this Court. For the reasons stated in this Memorandum Opinion and Order, Wilson's claims for relief is DENIED and a take nothing judgment is rendered against Wilson.

## BACKGROUND[4]

In 2012, Wilson agreed to assist Silva in acquiring an Allstate Agency from Daryll W. Martin. Wilson was aware that this Allstate Agency was for sale and Wilson had the financial ability to purchase its book of business. Wilson and Silva entered into an oral agreement where Wilson would purchase the book of business known as the Martin & Associates Insurance Agency, Inc. ("Martin Agency"). Wilson would be the owner of the book of business, and Silva would be the named agent of record and would manage the insurance book of business. Additionally, Wilson and Silva orally agreed that Silva would be paid a management fee for running the Allstate agency. As part of the agreement, Wilson and Silva orally agreed that all Allstate commission checks would

---

[2] "ECF" refers to the electronic case file docket number.
[3] The Federal Rules of Bankruptcy Procedure shall be referred to as the "Bankruptcy Rule(s)" unless otherwise noted.
[4] The Background Section of this Memorandum Opinion is derived from Plaintiff's Complaint, ¶ ¶ 7-11. (ECF No. 1).

be directed into an account that Wilson controlled, maintained, and supervised. Further, Wilson and Silva agreed that after three to five years, Silva would be given the option to purchase the book of business from Wilson.

In 2012, Wilson executed a note with AccessBank on behalf of DGW Financial Services, L.P. ("DGW") for the purchase of the book of business from the Martin Agency. On July 19, 2012, Silva signed an Offer to Purchase with Daryll Martin as President of the Martin Agency, using the funding from Wilson and DGW, and became the agent of the record for the book of business, known as Silva Insurance & Associates and/or Silva Insurance & Associates Company.

For the months of December 2012, January 2013, and February 2013, Silva directed all commission checks from Allstate into Wilson's bank account. Silva thereafter breached the agreement by unilaterally directing the Allstate commission checks to Silva's bank account, without Wilson's consent or permission. On February 6, 2015, Wilson filed an Original Petition against the Silva and his associated companies in a lawsuit styled *Danny G. Wilson, and DGW Financial Services, L.P. v. Arthur J. Silva, Lord & Silva, LLC d/b/a Silva Insurance & Associates, and Silva Insurance & Associates Company*, Cause No. 417-00548-2015, in the 417th Judicial District Court of Collin County, Texas ("State Court Lawsuit").

## PARTIES' CONTENTIONS

Wilson contends Silva's acts caused willful and malicious injury to Wilson pursuant to 11 U.S.C. § 523(a)(6) by inducing Wilson to take out a loan to assist Silva in acquiring the Allstate Agency and then directing the Allstate commissions to Silva as opposed to Wilson. As a result, Wilson risked losing the collateral Wilson pledged for the loan when Wilson did not have access to the commissions that Silva was required to pay Wilson under the agreement. Silva disputes Wilson's contentions by asserting that he did not have the requisite intent to injure Wilson.

Additionally, Wilson asserts that there are numerous omissions in Silva's bankruptcy schedules and statement of financial affairs that were not cured upon subsequent amendment that support denying Silva's discharge under § 727(a)(4). Silva disputes any intent to file false or misleading schedules or statement of financial affairs and argues that any non-disclosure was inadvertent and subsequently cured.

### THE STATE COURT JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Wilson filed an Original Petition against the Silva and his associated companies in the 417th Judicial District Court of Collin County, Texas. Silva appeared and filed an answer on March 25, 2015. On September 16, 2019, the State Court conducted a jury trial which resulted in a judgment in favor of Wilson for actual damages in the amount of $336,745.68 and attorney's fees in the amount of $182,610.00, plus costs. The only cause of action Wilson asserted in the State Court lawsuit was for breach of contract, so the jury only awarded damages and costs for breach of contract.

As noted herein, Silva moved for partial summary judgment in this Adversary Proceeding alleging that under the doctrines of collateral estoppel and res judicata, the State Court's judgment precluded this Court's determination of nondischargeability for fraud or willful and malicious injury. The Court agreed with Silva that a finding of breach of contract could not serve as a basis for the Wilson to allege fraud because Wilson failed to plead fraud in his state court petition. As to the issue of whether a breach of contract determination in a state court judgment precluded this Court from deciding a willful and malicious injury under § 523(a)(6), the Court held that under *Williams v. International Brotherhood of Electrical Workers Local 520*, the Fifth Circuit has found that a breach of contract may involve an intentional or substantially certain act to cause

injury. 337 F.3d 504, 510 (5th Cir. 2003) (citation omitted). As such, the Court denied summary judgment as to § 523(a)(6).

### FINDINGS OF FACT

The parties did not submit a joint pre-trial order in advance of trial. Local Rule 7016(c) advises that the parties should confer and file a joint pretrial order when possible. As a result, there are no stipulations of fact that the Court can incorporate into its Memorandum Opinion and Order other than Defendant's Answer admitting allegations in the Original Complaint. As an initial matter, Plaintiff's Exhibits 1-130 and 132 -150 were admitted into evidence.[5] Three witnesses testfied: Wilson, Silva, and Silva's bankruptcy counsel who filed Silva's chapter 7 case, Chance McGhee.[6] The Court finds that all three witnesses were credible but weighs the testimony of Wilson and McGhee more favorably because the Court found their testimony more credible and persuasive.

Additionally, the parties at times debated and offered evidence regarding if there was an agreement between Wilson and Silva. The Court must give comity to the State Court jury charge and judgment that found that there was an agreement between Wilson and Silva and that Silva breached the agreement.[7] The Court will not revisit any evidence regarding the existence of a contract and if it was breached.

Plaintiff Danny G. Wilson

The Court found Plaintiff Danny G. Wilson to be a credible witness and honorable man concerned with helping others. Wilson has been in the insurance business since 2003. Wilson has

---

[5] Defendant did not introduce any exhibits and relied upon Plaintiff's exhibits for documentary evidence. Therefore, all references to exhibits are listed as "Ex. _".

[6] Debtor/Defendant Arthur Silva voluntarily waived the attorney client privilege for Mr. McGhee to testify.

[7] The jury charge and judgment were not part of Plaintiff's trial exhibits, but they were included in Defendant's Motion for Summary Judgment. (ECF No. 11). The Court can take judicial notice of the jury charge and judgment pursuant to Fed. R. Evid. 201.

owned and operated several agenicies during that time. Wilson met the Silva after a tornado had caused extensive damage in Prosper, Texas. Wilson explained that Silva was acting as a claims advocate for homeowners who had suffered property losses. Wilson found Silva to be competent and motivated to serve the needs of his customers. Wilson was impressed with Silva's ability and suggested that Silva consider acquiring an insurance agency.

Based on these impressions, Wilson discussed with Silva the prospect of Silva acquiring his own insurance agency. Silva was interested in Wilson's proposal but indicated that he did not have or would be able to qualify for financing the acquisition of an insurance agency.[8] Wilson advised Silva that he was on the board of AccessBank Texas and that Wilson could use his relationship with the bank, plus his credit and assets, to assist Silva in acquiring an insurance agency.[9] Wilson and Silva also discussed how Silva would compensate Wilson for assisting him in the acquisition of an insurance agency.

Wilson explained that Silva would operate the insurance agency in Silva's name. Silva's responsibility was to operate the business and increase the book of business through writing new insurance policies. Silva would then pay Wilson $5,000/month to compensate Wilson for acquiring the insurance agnecy and for Wilson to service the loan he obtained from his bank. Arthur Silva's wife, Carrie Silva, would assist Silva in the operation of the agency.[10] The Silvas began operating the Martin Agency on October 1, 2012. Initially, several of the employees expressed concerns over the way the business would be managed and what the Silvas' expectations were for the continuation of the business.[11] After the Silvas began operating the agency, both Wilson and

---

[8] *See* Ex. 49 wherein Silva expressed his desire to acquire an insurance agency and requested Wilson provide financial backing to acquire an insurance agency.
[9] *See* Ex. 34 (Asset Purchase Agreement) and Ex. 3 (Addendum to Offer to Purchase between Arthur Silva buyer/purchaser and Daryll W. Martin as seller) regarding the sale of the Martin Agency to Arthur Silva.
[10] *See* Ex. 81 regarding Carrie Silva's review of Martin Agency employees and their roles with the agency.
[11] *See* Exs. 48, 87, and 88 wherein Allstate employees express frustration and anxiety about how the Martin Agency will be managed and operated.

6

agency employees expressed concern about business operations and whether the agency was making a profit or was able to pay its expenses.[12] As a result, Wilson wrote Silva on January 4, 2013, to verify that Silva was using the same accounting system Wilson had used to track commissions and that office employees were actively engaged in following leads and writing new insurance policies.[13] On May 24, 2013, AccessBank Texas wrote Wilson advising him that the commissions from Silva insurance agency were not being put into the bank's account, which was an event of default under Wilson's loan with the bank.[14] This revelation was significant in several ways: (1) Silva did not tell Wilson that he had diverted agency insurance commissions from Wilson's bank to Silva's bank; (2) Wilson had provided the loan and capital for Silva's acquisition of Allstate insurance agency; and (3) Silva misdirecting insurance commissions put Wilson's loan in default and subjected Wilson's assets to foreclosure for the default.

Wilson testfied that he attempted to get the insurance book of business from Silva, but Silva refused, asserting that he owned the insurance book of business. Further, Wilson stated that he offered to purchase the business back from Silva. Wilson had also located buyers to buy the insurance business, but Silva refused to sell the business.[15] Wilson filed a state court lawsuit to recover his lost investment, and, after several years of litigation, Wilson obtained a judgment against Silva in excess of $616,00.00. Silva filed a chapter 13 bankruptcy petition in 2020 that was dismissed and then filed his current chapter 7 case in 2021. Silva's choice to file bankruptcy forced Wilson to collect his judgment through the bankruptcy process.

---

[12] *See* e.g. Ex.90 (Reyna email about whether employees will be paid on time) and Ex. 122 (Carrie Silva email to Wilson about payment of salaries and loan payment to Wilson).
[13] Exs. 59 and 98.
[14] Ex. 28.
[15] Wilson terminated his agreement by email to Silva on October 18, 2013. Ex. 66.

Defendant Arthur Silva

Silva testified that he had filed chapter 13 petitions in 1996 and 2020 before filing his current chapter 7 case in 2021. Silva was asked a number of questions about prior businesses and if he had disclosed those businesses in his bankruptcy cases. For example, Silva disclosed that he owned four businesses on question 4 on his 2020 chapter 13 petition but disclosed six businesses on his chapter 7 petition on question 4.[16] Silva explained that the discrepancy in the number of businesses listed related to his formation post-chapter 7 filing of Biggrizz Outreach Ministries LLC, which owns a barbeque smoker and trailer.[17] Silva explained that he donated both items to Biggrizz to cook for and feed the homeless. Silva further explained that he did not list Silva Construction and Silva Insurance on his earlier chapter 13 petition because he unintentionally forgot to disclose them. Moreover, Silva testified that he relied upon his bankruptcy counsel to prepare his bankruptcy petition, schedules, and statement of financial affairs. In addition, because Silva's chapter 7 case was filed during the COVID pandemic, Silva did not have an in person meeting with his counsel to prepare and review his filings and he reviewed his bankruptcy pleadings with his counsel virtually.

Silva was also asked a number of questions regarding the value of his home, the amounts of liens against his homestead property, and whether his homestead had any equity based on Silva's perception of his home's value. Wilson's counsel contended through cross examination that Silva had made inconsistent statements regarding the amount of the IRS's tax liens against his homestead property. Silva stated that the reason the IRS's secured claim changed in amount was due to amendments that his attorney made.[18] Additionally Silva was asked about the value of his

---

[16] Exs. 134, 142.
[17] Biggrizz Outreach Ministries LLC was not initially disclosed on Silva's Schedules nor was the transfer of the barbeque pit and trailers in his prior chapter 13 case filed in 2020.
[18] *Cf*. Ex. 133 (Amended Schedules dated May 4, 2021 listing the IRS's secured claim of $290,283.84) *with* Ex. 150

insurance agency and the amount of any lienholder interest. Silva stated that he initially listed the insurance agency franchise value as between $350,000–$400,000 with Oak Street Funding as lienholder having a debt of $400,000.00. Silva listed the value of the insurance agency in his Amended Schedules (dated May 4, 2021) in the amount of $314,213.32. Silva explained that the difference in value was because Allstate had provided a valuation if Silva were to terminate his franchise agreement with Allstate.

Silva was also asked about a number of debts for which creditors filed proof of claims and Silva did not list in his schedules.[19] Silva was unable to explain why the debts were not listed in his schedules. Additionally, Silva could not explain why there was only one transfer listed in his original schedules dated December 9, 2020, but there were four additional transfers that were included in his amended schedules dated December 20, 2020.[20] Silva did state, however, that the Trustee asked him about the transfers on his amended schedules to which Silva stated that the transfers occurred in 2019 for a total amount of roughly $35,000.00. All of the transfers were for the sale of personal or real property. Finally, Silva did acknowledge that he gave a barbeque smoker and two trailers to his business, Biggrizz Ministries, LLC, to feed the homeless.

Attorney Chance McGhee

Chance McGhee is an experienced and competent attorney that has practiced consumer bankruptcy law for many years. McGhee acknowledged that he did file a number of amendments

---

(IRS notices of federal tax liens for unpaid Form 1040 income taxes [years 2013-2017] with a total amount of $121,533.13) suggesting that the Silva misrepresented his tax liability to reduce the prospect of there being any equity in his homestead. Assuming that assertion to be correct, Silva would be entitled to keep any equity in his homestead upon sale under the Fifth Circuit's opinion in *Lowe v. DeBerry (In re DeBerry)*, 884 F.3d 526 (5th Cir. 2018) (holding that a chapter 7 debtor was not required reinvest the proceeds from his exempt homestead upon sale because by exemption, the homestead property was removed from the bankruptcy estate).

[19] *See* Exs. 147 (Pinnacle Credit Services LLC proof of claim); Ex. 148 (Citibank proof of claim); and Ex. 149 (LVNV Funding LLC proof of claim). All three claims are general unsecured nonpriority claims.

[20] *Cf.* Ex. 134 (Statement of Financial Affairs, part 7 regarding the sale of an automobile to Ruiz Motors) with Ex. 132 (Amended Statement of Financial Affairs listing four additional transfers (sales) to four individuals including Silva's sister).

to Silva's schedules and statement of financial affairs. McGhee explained that as a precursor to filing an individual consumer case, he obtains a credit report to determine a debtor's liabilities. McGhee explained that a number of debts on a credit report may have been transferred to collection agents or still are listed even though the statute of limitations for collection had passed. McGhee further explained that he sometimes has to amend a debtor's schedules to reflect if a debt has been transferred or assigned to another creditor or collection agent, and, also to indicate if a claim is uncollectible due to limitations.

McGhee explained that the reason for the changes in Oak Street Funding LLC's claim were in part because Oak Street Funding LLC filed a motion for relief from stay that listed a different amount than what Silva thought was the amount.[21] As to the discrepancies in the amount and character of the IRS's proof of claim, McGhee explained that he decided to change the amount of the IRS's secured claim based on the amount of equity in Silva's asserts when Silva amended his exemptions to state exemptions.[22] In sum, Silva had nothing to do with any changes to the schedules regarding the IRS's proof of claims or how the claims impacted any equity regarding Silva's homestead.

Independent of this Adversary Proceeding, there was a dispute as to the valuation of Silva's homestead. Wilson argued that the Silva artificially reduced the value of the homestead. Silva used the taxing authority's appraised value for valuing the homestead. Wilson objected to the homestead's equity being exempt under the federal exemptions. Silva hired an appraiser to

---

[21] McGhee admitted that if he had the information Allstate provides regarding the value of the business upon termination of the franchise agreement, McGhee would have used that value when he filed the original schedules. McGhee subsequently learned that the termination value is readily available to franchisees. McGhee agreed he should have used that value on the original schedules.

[22] McGhee acknowledged that he did not compare the IRS's proof of claim in Silva's dismissed chapter 13 case with the IRS's proof of claim in Silva's chapter 7 case. McGhee did state, however, that he used a different methodology for valuing Silva's homestead in his chapter 7 case as to how the homestead was valued in the prior chapter 13 case that was dismissed.

appraise the homestead, resulting in a higher value. As a result, Silva amended his exemptions

from federal to state exemptions because Texas has an unlimited homestead exemption. Therefore,

Wilson's objection to exemptions was rendered moot. Bankruptcy Rule 1009(a) permits a debtor

to amend a schedule as a matter of course at any time before the case is closed. Here, Silva timely

amended his Schedule C of exempt assets to protect his home from forced sale. Wilson alleged in

his Complaint, but did not provide any evidence, as to why such an amendment provided for denial

of his discharge under § 727(a)(4). Wilson also alleged that the Silva erroneously listed the value

of his home electronics. McGhee acknowledged he made a mistake in listing the value at zero for

electronics. As such, upon learning of the omission, McGhee corrected the error.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law:

**I.     Exception to Discharge Under 11 U.S.C. § 523(a)(6) Willful and Malicious Injury**

The standard of proof in a § 523(a) dischargeability action is by a preponderance of the

evidence. ***Grogan v. Garner***, 498 U.S. 279, 291 (1991). To establish nondischargeability, Wilson

must therefore show by a preponderance of the evidence that Silva willfully and maliciously

caused Wilson's injuries. An individual may not obtain discharge of debts incurred through his

own wrongful conduct. ***In re Tegeler***, 586 B.R. 598, 635 (Bankr. S.D. Tex. 2018).

Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, that:

(a) A discharge under section 727 . . . of this title does not discharge an individual
   debtor from any debt— . . .
   (6) for willful and malicious injury by the debtor to another entity or to the property
   of another entity.

In other words, debts for "willful and malicious injury" are not dischargeable in a Chapter

7 case. 11 U.S.C. § 523(a)(6); ***Kawaauhau v. Geiger***, 523 U.S. 57 (1998). Under ***Geiger***, the

word "willful" modifies the word "injury," meaning a debtor must have intended not only to

11

commit an act resulting in the plaintiff's injury, but to also inflict the injury itself. 523 U.S. at 61. Accordingly, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id*. at 64.

The Fifth Circuit employs a two-part test to determine willful and malicious injury. *Williams*, 337 F.3d 504 (5th Cir. 2003). An injury is willful and malicious if the plaintiff proves "either an objective substantial certainty of harm or a subjective motive to cause harm." *Id*. at 509 (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)). To establish an objective substantial certainty of harm, the court must "analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009). Courts find a subjective motive to cause harm when a defendant acts "deliberately and intentionally, in knowing disregard of the rights of another." *In re Gharbi*, No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011), *aff'd*, Cause No. A-11-CA-291-LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011). "Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful." *Williams*, 337 F.3d at 509 (citation omitted). In *Berry v. Vollbracht (In re Vollbracht)*, the Fifth Circuit restated the test for willful and malicious injury as involving an inquiry "of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." 276 F. App'x. 360, 361–62 (5th Cir. 2007). For an injury to be "willful and malicious," it must satisfy the two-part test and not be sufficiently justified under the circumstances to render it not willful and malicious. *Id*. at 362.

The evidence adduced is critical to the Court's determination of willful and malicious behavior. Wilson's counsel only asked Silva about the omissions or misstatements in his schedules

and statement of financial affairs. Wilson's counsel did not ask Silva any questions regarding his conduct or why Silva thought he could divert Allstate commissions to Silva's bank account. Silva's counsel intentionally did not examine Silva, recognizing that Wilson had the burden of persuasion by a preponderance of the evidence. There was no oral testimony on Silva's state of mind or his subjective intent. The only testimony regarding Silva's conduct involving Wilson's loan was that Silva took out a loan to attempt to pay Wilson. Although the Court admitted roughly 150 exhibits by agreement that included many emails between the parties, the Court was only introduced to small number of the exhibits. Notably, some of the exhibits suggest that after Wilson terminated the agreement, the parties continued to have discussions regarding how to resolve their differences.[23]

The Court recognizes that Silva breached the agreement and was liable for damages caused to Wilson. What is unclear to the Court is whether Silva acted objectively or subjectively to cause harm to Wilson. The Court notes that the breach of a contract gives rise to damages, but there is insufficient evidence to find that Silva's breach of the agreement demonstrates subjectively or objectively an intent to harm Wilson. Based on the evidence provided, the Court cannot find that Silva had a subjective motive by acting deliberately and intentionally in knowing disregard of Wilson. There is insufficient evidence on subjective intent to cause harm.[24] Additionally, the Court cannot find that Silva's actions were objectively substantially certain to cause injury. Wilson did discuss how the diversion of Allstate payments impacted him, but there is insufficient evidence that Silva's actions were certain to cause harm. As such, the Court finds that Wilson has not met

---

[23] Exs. 67–71.
[24] The Fifth Circuit in **Williams** noted that a knowing breach of contract requires explicit evidence that a defendant's breach was intended or substantially certain to cause the injury to the plaintiff. 337 F.3d at 511.

his burden by a preponderance of the evidence that Silva's liability to Wilson is nondischargeable under § 523(a)(6).

## II.   Denial of Discharge for Making a False Oath Under 11 U.S.C. § 727(a)(4)(A)

Section 727(a) provides that a court must grant a discharge unless one or more grounds for denial of discharge under §§ 717(a)(1)–(12) is proven to exist. The burden of proving a denial of discharge under §§ 727(a)(1)–(12) lies with the party objecting to discharge, and is by a preponderance of the evidence. *Beaubouef v. Beaubouef*, (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992). Here, Wilson objects to Silva's discharge pursuant to § 727(a)(4)(A).

Section § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." Here, Wilson alleges Silva made numerous omissions and false statements.

The elements a plaintiff must show under § 727(a)(4)(A) are: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *Beaubouef*, 966 F.2d at 178). "An omission of an asset can constitute a false oath." *Pratt*, 411 F.3d at 566.

Notably, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986). Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge. *See e.g., Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 65 (Bankr. E.D. Tex. 1996) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest

mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor

must have willfully made a false statement with intent to defraud his creditors.").

Nevertheless, a debtor need not have acted deliberately to deceive. *Beaubouef*, 966 F.2d

at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he

makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what

will prejudice, them.") (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.

1984) (per curiam)). The requisite intent can be shown by establishing that the debtor acted with

reckless disregard for the truth, which can be proven by circumstantial evidence. *In re Sholdra*,

249 F.3d 380, 382 (5th Cir. 2001) ("[S]tatements [made] with fraudulent intent–or reckless

indifference to the truth . . . can be proven by circumstantial evidence."); *Beaubouef*, 966 F.2d at

178 ("[T]he existence of more than one falsehood, together with [the debtor's] . . . failure to take

advantage of the opportunity to clear up all inconsistencies and omissions when he filed his

amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent

to deceive."); *accord, In re Sullivan*, 204 B.R. 919, 942–43 (Bankr. N.D. Tex. 1997) ("A series

of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard

for the truth. . . . Thus, courts look at the circumstances surrounding the omissions to determine

whether they were intentional.") (citing *Morris*, 58 B.R. at 428). A debtor's fraudulent intent may

be established through actual evidence of intent to defraud or through the cumulative effect of

many falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth. *In re*

*Crumley*, 428 B.R. 349, 366–67 (Bankr. N.D. Tex. 2010) (citing *Sholdra,* 249 F.3d at 383).

The denial of a discharge—the "death penalty" sanction of bankruptcy—must not be

undertaken lightly. *Crumley*, 428 B.R. at 367. (citing *Washington 1993, Inc. v. Hudson (In re*

*Hudson),* 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009)). Unquestionably, a debtor's paramount duty

is to consider carefully all questions posed on the petition, schedules, and statements, and to verify the information listed is correct. ***Morton v. Dreyer (In re Dreyer)***, 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991). Nevertheless, "[i]t may be close to impossible to produce Schedules and SOFAs that contain no mistaken information." ***Cadle Co. v. Preston–Guenther (In re Guenther)***, 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005)). In other cases, such as ***Crumley***, reckless disregard for the truth was found where the Debtor prepared his SOFA's using "gest guesstimate" figures and "never attempted to reconcile all of his sources of income prior to trial." 428 B.R. at 367 (denying discharge to the husband under § 727(a)(4)(A) for reckless disregard).

The Court finds that Wilson has only met two of five elements under the Fifth Circuit's test in ***Beaubouef***. First, Silva's statements in his schedules and statement of financial affairs were made under oath. Second, as to whether the statements were false, the Court finds that some of the statements were false when originally made but later corrected. Third, as to the element that the Silva know the statements were false, the Court finds that Silva did not. Silva offered credible explanations for why he made each statement. In summary form, Silva offered the following evidence from himself or Mr. McGhee as why the statements were not knowingly made false:

(1) Failure to list Biggrizz – Silva explained that Biggrizz was formed after filing his chapter 7 case for the sole purpose of feeding the homeless. Silva acknowledged he contributed his personal assets to the LLC. While the chapter 7 trustee could have sought recovery of those assets, the trustee did not because of the limited value of a barbeque pit and trailer. The omission of Biggrizz was later disclosed, and the Court finds that the omission was not intentionally false.

(2) Failure to list dba Silva Insurance – the Court cannot discern how this omission was false given that the only insurance agency Silva operated that produced income was the Allstate agency.

(3) Undervaluing his homestead – while the Court acknowledges that Silva should have been more cooperative in assisting Wilson in appraising his home, the explanation that McGhee gave using the taxing appraisal valuation in the original schedules is consistent with what other consumer lawyers do in this district. A chapter 7 debtor often does not have the funds pay for an appraisal of a homestead. Nonetheless, Silva did order an appraisal of his home, and when the appraisal resulted in a higher value, McGhee dutifully amended the schedules to reflect the increase in value. Moreover, Debtor's change from federal to state exemptions is permitted under Bankruptcy Rule 1009(a) and reflects good lawyering to protect assets from liquidation in a chapter 7 case.

(4) Valuing Silva's electronics at zero – the Court finds McGhee's testimony credible that he made a mistake on the schedules in listing the electronics' value at zero when it should have been roughly $2,000.00. The Court agrees with Wilson that this was a significant oversight but questions the materiality of this false statement given that the chapter 7 trustee did not seek turnover of the electronics for liquidation.

(5) Undervaluing Silva Allstate franchise's agreement – Wilson argued that Silva intentionally undervalued his franchise agreement with Allstate in his original schedules. Silva testified that he provided an original value to his bankruptcy counsel based on his understanding of the going concern value of his Allstate franchise. McGhee then realized that he needed to change the valuation based upon what Oak Street Funding LLC believed Silva's Allstate franchise value to be in its motion for relief from stay. Further, when Silva requested the termination value of the Allstate franchise agreement in response to Oak Street Fundings LLC's motion for relief from stay, McGhee testified that he only thought that the schedules needed to be amended when he became aware of a different valuation by Oak Street and Allstate.

(6) Claiming federal exemptions in Silva's cash and investment accounts; Silva's insurance companies; Biggrizz; and the Allstate Franchise Agreement –Wilson complains of Silva's use of federal exemptions to preclude the chapter 7 trustee from liquidating some of Silva's assets because cash can be exempted if a debtor elects federal, but not state, exemptions. If Wilson's counsel had any concerns about these exemptions, counsel should have objected to these exemptions. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 642-43 (1992) (finding that failure to object timely to a claim of exemptions results in the subject property being excluded as property of the estate). The Court fails to understand how asserting federal exemptions somehow qualifies as an omission or false statement under § 727(a)(4)(A). Regardless, Wilson's argument is moot because Silva changed to Texas exemptions which do not protect cash.

(7) "Amending Silva's Schedule C to claim both the monetary value of the majority of his exempt assets as well as claiming 100% of fair market value"[25] – the Court is perplexed by this assertion. Maximizing exemptions is precisely what a debtor's counsel should do to achieve the broadest discharge possible for a debtor. The Supreme Court's holding in *Schwab v. Reilly* permits using 100% of the fair market value to exempt assets. 560 U.S. 770 (2010).

(8) Increasing the amount of the IRS's secured claim on Silva's hoemstead from $132,852.12 to $290,283.84 – Wilson posits that Silva manipulated the amount of the IRS's secured claim. The Court is not certain how a recharacterization of the IRS's claim is a false oath or material to a denial of discharge. Mr. McGhee explained that he amended the amount of the IRS's claim based upon the liquidated amount of the claim, adjusted for penalty and interest, and the valuation of Silva's assets. [26] This argument is irrelevant because, in Texas, an interest in

---

[25] Wilson phrased his legal theory as quoted above. ECF No. 17, at 9.
[26] Plaintiff also complains that the IRS's unsecured claim was changed multiple times in Silva's schedules. This can be explained because once the IRS's claim became a liquidated amount, and Silva increased the amount of the IRS's secured claim due to the value of Silva's homestead, the IRS's unsecured claim was reduced.

homestead is entitled to an unlimited exemption. Tex. Prop. Code Ann. §§ 41.001–41.002; Tex. Const., Art. 16, §§ 50–51. As such, the fact that Silva elected to increase the value of his homestead and elect state exemptions is not a false oath.

(9) Decreasing the amount of the secured debt of Oak Street Funding from $400,000 to $342,584.06 – the record evidence was that Silva estimated the value of his interest in his insurance agency at $400,000 without any basis other Silva's perceived value. During his chapter 7 case, Silva and McGhee learned that they could get a franchise termination value for the insurance agency, which Silva used. As a result, the valuation was lower but more accurate. The change in value was not attributable to any manipulation by Silva, but an independent valuation of what Silva's interest would be should he elect to terminate his franchise agreement with Allstate.

(10) Wilson asserts that the failure to list certain unsecured creditors is a material omission. The Court disagrees. There is no benefit to a debtor not listing an unsecured creditor because debts which are neither listed nor schedules cannot be discharged under § 523(a)(3). Further, as McGhee explained, the failure to list some creditors is attributable to the debts being sold or transferred.

As to the fourth element—whether the debtor made the statement with fraudulent intent—Silva did not make any statements suggesting the omissions or false statements were made with fraudulent intent. The Court finds Silva's explanations credible as to why he originally listed his liabilities the way he did. Further, the Court cannot discern any attempt to prevent any creditor from learning about Silva's assets and liabilities. Silva repeatedly testified he disclosed his assets and liabilities to McGhee to the best of his knowledge and relied on McGhee's expertise to list the liabilities and assets appropriately. The Court also finds credible McGhee's explanations and rationale for the how the schedules were originally prepared and subsequently amended. The Court cannot find any basis to conclude that Silva purposely omitted any of his assets or liabilities.

19

The fifth element—the statements related materially to the bankruptcy case—the Court finds that none of the statements were material to the Silva's schedules and statement of financial affairs. As the Court has explained, most of Wilson's arguments concerned claimed exemptions to which the Wilson did not object. Failure to object undermines Wilson's materiality argument. The valuations that were corrected were based upon information later provided from third parties. More importantly, the decision to amend the schedules was by Silva's bankruptcy counsel, not Silva. The Court finds that none of the perceived omission were material and did not negatively affect Silva's chapter 7 case. Wilson has not carried his burden on showing a false oath under § 727(a)(4)(A).

## Conclusion

In summary, Wilson has not met his burden in establishing a denial of discharge of debt under § 523(a)(6) or a denial of discharge under § 727(a)(4).

Accordingly, IT IS ORDERED that Wilson is granted a take nothing judgment against Silva and Wilson's claims for relief are DENIED WITH PREJUDICE.

IT IS FURTHER ORDERED that each party is to bear its own costs.

IT IS FURHTER ORDERED that all other relief is DENIED.

# # #